UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2009 JAN 13  PM 12: 12

CLERK
BY _____  _____
DEPUTY CLERK

| | |
|---|---|
| WARBROS, LLC,                    ) | |
|                                  ) | |
| Plaintiff,            ) | CASE NO.: 1:09-CV-9 |
|                                  ) | |
| v.                               ) | |
|                                  ) | |
| TODD M. ENRIGHT and              ) | |
| MIDDLEBURY EQUITY                ) | |
| PARTNERS, LLC,                   ) | |
|                                  ) | |
| Defendants.          ) | |

## COMPLAINT

Plaintiff Warbros, LLC ("Warbros"), through its counsel Downs Rachlin Martin PLLC,

complains and alleges as follows:

### NATURE OF ACTION

This is an action for breach of contract, breach of implied covenant of good faith and fair

dealing, breach of fiduciary duty, and fraud arising out of an agreement between Defendant

Middlebury Equity Partners, LLC ("MEP") and Plaintiff Warbros, LLC ("Warbros") for the sale

to Warbros by MEP of a participation interest in a commercial loan.  Both Defendants MEP and

Enright are responsible and liable to Warbros for the willful, fraudulent, and deceitful breach of

the fiduciary and contractual obligations owing to Warbros under that agreement.

### PARTIES

1.      Warbros is a Rhode Island limited liability company with its principal place of

business in Westerly, Rhode Island.

2.      Defendant MEP is a Delaware limited liability company with places of business at

63 Old Northfield Rd., Hinsdale NH  03451, and in Brattleboro, Vermont.  MEP was once

DOWNS
RACHLIN
MARTIN PLLC

registered as a foreign limited liability company in the State of Vermont, but its registration was terminated on or about June 13, 2008, prior to the filing of this complaint. MEP lists "Private Equity Fund" as its business on its registration documents previously filed with the Vermont Secretary of State. MEP has a mailing address of P.O. Box 141, Brattleboro, Vermont.

3.     Todd M. Enright ("Enright") is the managing member of MEP. On information and belief, he now controls MEP. He also controlled MEP at the time of the events described in this Complaint. Mr. Enright personally resides at one or both of the following addresses: 72 Old Northfield Road in Hinsdale, New Hampshire, and/or 817 North Dawson St, Thomasville, Georgia.

JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because complete diversity exists between the parties. The amount in controversy exceeds $75,000, exclusive of interest, costs, or counterclaims.

5.     Venue is proper in the district pursuant to 28 U.S.C. § 1391(a)(1-3).

GENERAL ALLEGATIONS

6.     In 2003, Enright approached representatives of Warbros about buying a participation interest in two commercial loans Enright represented were owned by MEP. The commercial loans in which MEP was seeking to sell an interest were in the aggregate original amount of $502,250.00, and payable by Michael and Ellen Zoppo (the "Zoppos"). The loans (hereinafter the "Loans") were secured by mortgages on three properties owned by the Zoppos. All three of these mortgaged properties are all located in the Town of Bristol, Connecticut, at the addresses of 67 Kory Lane, 250 Terryville Avenue, and 165 Oakland Street therein.

7.     Warbros agreed to purchase a 39.82% interest in the Loans offered by MEP for

2

$200,000.00. This agreement was formalized in a Participation Agreement dated June 18, 2003, a true copy of which is attached hereto as Exhibit 1. MEP retained a participation interest equal to 60.18% of the Loans.

8.      In Section 3 of the Participation Agreement, MEP assigned to Warbros an interest in the Loans equal to $200,000, plus interest accruing thereon at the annual rate of 13%. This section of the Participation Agreement also acknowledged that MEP had sold and transferred to Warbros an undivided fractional interest in the borrowers' obligations under the Loan documents, all payments made in respect of the borrowers' obligations, all recoveries or distributions in connection with the borrowers' obligations, all present and future collateral (and all proceeds of same) securing the borrowers' obligations, and all other documents and instruments delivered in connection with the Loans.

9.      In Section 4 of the Participation Agreement, MEP agreed to service and enforce the Loans. Under this provision of the Agreement, the parties agreed that MEP and its representatives "shall not be liable for any actions taken, or omitted to be taken, in good faith, and they shall only be liable for grossly negligent, reckless, and/or willful misconduct."

10.     In Paragraph 4 of the Participation Agreement, MEP agreed to act as agent for Warbros in connection with the servicing and enforcement of the loan.

11.     In Section 7 of the Participation Agreement, MEP agreed that it would not have the right, without obtaining prior written consent of Warbros, to release any collateral or any other security securing repayment of the Loans. This section of the Participation Agreement also imposed the obligation on MEP to provide notice to Warbros of all material actions taken with respect to the Loans.

12.     Section 9 of the Participation Agreement provides for the distribution of funds

obtained by MEP through payments made by the borrowers, refinancing of the Loans by the borrowers, sale or disposition of any collateral in the event of borrower default, or any other recovery of all or part of the principal due from the borrowers.  Under this section of the Agreement, all such funds were to be distributed by MEP first in repayment of expenses of the participants, then to repayment of remaining principal and interest owed to MEP and Warbros, *pari passu*, then to repayment of default interest, late charges, and prepayment penalties to MEP and Warbros, *pari passu*.

13.     Section 9 of the Participation Agreement requires MEP to act as a fiduciary for the benefit of Warbros in connection with the receipt and distribution of all loan proceeds or proceeds from disposition of collateral or any other funds received on account of the Loans.

14.     Section 14 of the Participation Agreement provides that the Agreement shall be construed in accordance with and governed by the laws of the State of Vermont, excepting its principles of the law of conflict of laws.

15.     Since entering into the Participation Agreement with MEP in June of 2003, Warbros has received some payments of interest from MEP on account of its participation interest.  All payments ceased after March 2007.

SPECIFIC ALLEGATIONS OF WILLFULL AND WANTON BREACH OF
CONTRACT AND FRAUD

16.     On or about May 30, 2004, Michael Warburg, a Managing Director of Warbros ("Warburg"), telephoned Enright to ask him about the status of the Zoppos loans.  Enright represented to Warburg during this telephone call that the Zoppos were in the process of refinancing two of the properties.  Enright made these representations in order to lead Warburg to believe that Warbros' participation interest would be repaid in whole or in part through these

4

refinancings.

17.     On October 5, 2004, Enright represented to Michael Warburg in a telephone call that the Zoppos had a purchase and sale contract on one of the properties that stood as collateral for the Loans, again to cause Warburg to believe that some payment would be forthcoming from this transaction.  On February 2, 2005, Enright represented to Warburg that the Zoppos had requested a pay-off statement for the Loans, although it was uncertain whether a pending transaction for a sale or refinancing of some or all of the properties would take place.  Enright made these representations in order to lead Warburg to believe that Warbros' participation interest would be repaid in whole or in part through these transactions.

18.     On April 12, 2005, Enright, acting on behalf of MEP, executed a partial release of mortgage with regard to one of the parcels of property owned by Zoppos that was mortgaged to provide collateral for the Loans.  At this time, the property released from the mortgage securing the Loans was Lot 40-5 Kory Lane, Bristol, CT.

19.     Warbros did not consent to the release by MEP of the mortgage on this property. Neither Enright nor any other representative of MEP has ever provided any notice to Warbros of the release of the mortgage by MEP on Lot 40-5 Kory Lane, Bristol, CT.

20.     Instead of reporting the release of a portion of the collateral for the Loans to Warbros, Enright continued to represent to Warbros that MEP was on schedule to repay what was owed to Warbros under the Participation Agreement in 2005.  On May 31, 2005, in a telephone call with Michael Warburg, Enright represented that a transaction was scheduled for July 1, 2005, that would result in part or full payment of what was owned to Warbros under the Zoppo participation agreement.

21.     On December 28, 2005, MEP released the mortgage on Lots 40-1 and 40-2 Kory

Lane, Bristol, CT, again without the knowledge or consent of Warbros. Enright, as the managing member of MEP, must have had knowledge of this mortgage release.

22.     Neither Enright nor any other representative of MEP has ever reported or provided notice to Warbros of the discharge of mortgage on Lots 40-1 and 40-2 Kory Lane, Bristol, CT.

23.     On information and belief, MEP received payment from the Zoppos in exchange for its release of mortgage on the three lots located on Kory Lane, Bristol, CT. However, no funds received by MEP in exchange for its releases of mortgage on the property located on Kory Lane were paid or distributed to Warbros.

24.     Rather than provide notice to Warbros of the two separate mortgage discharges it had granted as to the Kory Lane property, or receipt of funds in exchange for those mortgage discharges, Enright led Warbros to believe that matters were dragging along with the Zoppos, and that a foreclosure action would be commenced to recover the real estate collateral. On January 25, 2006, in a telephone call, Enright told Michael Warburg that the Zoppos had been given 90-day ultimatums, after which foreclosure would commence.

25.     On March 21, 2006, via e-mail, Michael Warburg inquired of Enright as to the status of the Zoppo Loans, and the status of foreclosure. On April 11, 2006, Enright wrote by e-mail to Warburg that he was working on the sale of the Zoppo loans to another lender in the next 90 days. Enright also said in this e-mail that he was awaiting the addition of a new guarantor with a good credit score, and that this would allow MEP to "sell the deal off."

26.     Nine days later, on April 20, 2006, Enright signed on behalf of MEP a mortgage release, releasing the mortgage held by MEP on a second Zoppo property that stood as collateral for the Loans in which Warbros held a participation interest sold to it by MEP.

27.     MEP has never paid or distributed to Warbros any funds it received in exchange for its release of mortgage on the Zoppo property located at 250 Terryville Avenue, Bristol, CT, nor provided notice to Warbros of the release of this mortgage.

28.     Rather than provide accurate and complete information to Warbros concerning the status of the collateral for the Zoppos loans, Enright continued to mislead Warbros about the status of the Zoppo Loans and the collateral for the loans.  On August 25, 2006, Michael Warburg asked Enright via e-mail for an update on the progress of obtaining payment on the Zoppos.  On September 22, 2006, Enright wrote an e-mail to Warburg relating to the Zoppo loans, stating that "We are liquidating the assets.  We have the sale of one just about completed; we are just waiting on the environmental clearance which should be done the first of next week..  Should get you back about $50K of your investment.  We are selling the balance of the assets as well.  I hope to be totally out of the deal by spring '07."

29.     In fact, by the time he wrote this e-mail report to Mr. Warburg, Enright knew that MEP had already released its mortgages on two of the three properties that stood as collateral for the Zoppo Loans.

30.     Over the course of the next year, Enright continued to misrepresent the facts to Warbros concerning the status of the Zoppo Loans and collateral for the loans.  On October 25, 2006, Enright told Michael Warburg in a telephone call that a Zoppo property was "under contract" but needed environmental clearance to close, which should happen any time, and that he was pushing for sale of the two other properties.

31.     On January 10, 2007, Enright told Warburg via telephone call that he was still working on a sale of one or more of the Zoppo properties, and that the collateral for the Zoppo Loans was "good."

7

32.     On April 10, 2007, Enright told Michael Warburg via e-mail that "Zoppo is back on the foreclosure track given that they have not refinanced the debt."

33.     On April 11, 2007, Michael Warburg told Enright via telephone that Warbros was in favor of foreclosing on all properties, and Enright agreed to proceed in this way.  On August 1, 2007, Michael Warburg wrote by e-mail to Enright asking for a concrete plan to realize on the collateral for the Zoppo Loans, and also asking to be more involved in the process so that Warbros could see a path to realization and repayment of the loans.  In response to this, Enright told Warburg in a telephone call on August 7, 2007, that the lawyers were working on  the Zoppo loans and that he would forward to Warburg the legal briefs relating to the ongoing legal action.

34.     On September 9, 2007, Enright told Warburg by e-mail that he had received a request from counsel for Zoppo for a loan payoff quote.  On September 17, 2007, Enright told Warburg in a telephone call that the Zoppos were looking for a discounted pay-off figure, and that legal actions would continue absent some evidence of funding available to pay the loan.

35.     In October of 2007, Warburg and Enright agreed to meet to discuss the Zoppo Loans.

36.     On November 12, 2007, Michael Warburg and John Warburg of Warbros met with Enright in New Haven, CT.  The three men discussed all three properties that Warbros believed were still collateral for the Zoppo Loans:  (i) 250 Terryville Avenue; (ii); 165 Oakland Street; and (iii) 67 Kory Lane, all in Bristol, CT.  Enright explained that there were some environmental issues with the Terryville Avenue property.  He also said that he had been trying to negotiate a deal for the Zoppos to turn over title to the Kory Lane property.  He also said that the Oakland Street property would go to foreclosure if a deal could not be struck with Zoppos that week.  During this meeting, Enright said nothing to the Warburgs about any prior sale or

disposition of the 250 Terryville Avenue or 67 Kory Lane properties, or that MEP had discharged the mortgages on those properties in late 2005 and early 2006.

37.     Warbros did not discover that MEP had discharged the mortgages on the Zoppo properties at 250 Terryville Avenue and 67 Kory Lane until it conducted its own investigation in the public land records in Bristol, CT in 2008.

### COUNT I:  WILLFUL AND WANTON BREACH OF CONTRACT (against MEP)

38.     The Plaintiff incorporates by reference Paragraphs 1-37 of this Complaint, as if set forth fully herein.

39.     The Participation Agreement between MEP and Warbros constitutes a valid and binding contract.

40.     Defendant MEP has breached the Participation Agreement, by failing to comply with the contractual obligations imposed upon it, in particular those set forth in Sections 3, 4, 7 & 9 thereof.

41.     As a result of Defendant MEP's breach of contract, Warbros has suffered actual, incidental and/or consequential damages, including but not limited to costs and attorneys' fees.

42.     MEP's breach of contract as described herein was willful and wanton.

### COUNT II:  BREACH OF IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING (against MEP)

43.     The Plaintiff incorporates by reference Paragraphs 1-42 of this Complaint, as if set forth fully herein.

44.     The Participation Agreement, being governed by Vermont law, imposes on all parties thereto an implied covenant of good faith and fair dealing.

45.     Defendant MEP has breached its implied covenant of good faith and fair dealing by, *inter alia*:  (i) failing to remain faithful to the agreed common purposes set forth in the

Participation Agreement, consistent with the justified expectations of Warbros; (ii) undermining and destroying Warbros' rights to receive the benefits of the Participation Agreement; (iii) abusing its power and control over proceeds paid by the borrower to deprive Warbros of its contractual rights; and (iv) interfering with and/or failing to cooperate in Warbros' performance under the Participation Agreement.

46.     MEP knew or should have known that Warbros would suffer substantial injury if MEP released mortgages securing the Loan without first consulting Warbros and without distributing monies received in exchange for mortgage releases, yet MEP disregarded its obligations under the Participation Agreement.

47.     As a result of Defendant MEP's willful and wanton breach of the implied covenant of good faith and fair dealing, Warbros has suffered actual, incidental and/or consequential damages, including but not limited to costs and attorneys' fees.

## COUNT III:  BREACH OF FIDUCIARY DUTY (against MEP)

48.     The Plaintiff incorporates by reference Paragraphs 1-47 of this Complaint, as if set forth fully herein.

49.     Under the Participation Agreement, in its capacity as Warbros' agent in the servicing and enforcement of the Loan, MEP owed Warbros a fiduciary duty of trust and confidence in connection with the receipt and distribution of all Loan proceeds or proceeds from disposition of collateral or any other funds received on account of the Loan.

50.     MEP as servicing agent for Warbros had a duty to act both reasonably and competently.

51.     MEP had a duty to act in the best interest of Warbros, and not to unduly favor MEP's interests.  Despite these duties, MEP acted in bad faith and breach of trust.

52.    MEP was grossly negligent, reckless, and willfully disregarded the terms of the Participation Agreement, thereby elevating its interests over those of Warbros.

53.    As a result, Warbros has suffered actual and consequential damages.

### COUNT IV:  FRAUDULENT MISREPRESENTATION / DECEIT
### (against MEP and Enright)

54.    The Plaintiff incorporates by reference Paragraphs 1-53 of this Complaint, as if set forth fully herein.

55.    The natural and ordinary meaning of the words used by Defendant Enright in his communications with Warbros and its representatives about the Zoppo Loans, as described more particularly above, constituted intentional misrepresentations of existing material facts.

56.    The facts misrepresented by Enright to Warbros were false when conveyed, and were known by Defendant Enright to be false when conveyed.

57.    The facts misrepresented by Enright to Warbros were not open to Warbros' knowledge.

58.    The misrepresentations were justifiably relied upon by Warbros, to Warbros' detriment.

59.    Defendants Enright and MEP, as a result of these misrepresentations, have caused the damages sustained by Warbros that are connected thereto.

### COUNT V:  FRAUDULENT CONCEALMENT / DECEIT (against MEP and Enright)

60.    The Plaintiff incorporates by reference Paragraphs 1-59 of this Complaint, as if set forth fully herein.

61.    As described more particularly above, Defendant Enright, individually and as agent of Defendant MEP, failed to disclose material facts of which MEP and he had superior knowledge or the means of knowledge.

11

62.     Defendants Enright and MEP had a duty to disclose such information to Warbros.

63.     Defendants Enright and MEP had the intention to mislead or defraud Warbros when they concealed such material facts.

64.     Warbros justifiably relied on the incomplete information provided to it by Defendants Enright and MEP, resulting in damage to Warbros.

### COUNT VI:  PUNITIVE/EXEMPLARY DAMAGES (against MEP and Enright)

65.     The Plaintiff incorporates by reference Paragraphs 1-64 of this Complaint, as if set forth fully herein.

66.     The action, inaction, and/or conduct of MEP and Enright as described above were willful and/or manifested a reckless or wanton indifference toward, and disregard of, Warbros' rights.

67.     The action, inaction, and/or conduct of MEP and Enright as described above merits punishment in the form of an award of punitive or exemplary damages against Defendants Enright and MEP.

WHEREFORE, Plaintiff Warbros respectfully requests judgment against Defendants MEP and Todd Enright, joint and severally, awarding to Warbros the following relief:

A.     A money Judgment for $232,304.49, which Judgment may provide for the transfer of the Participation Interest by Warbros to MEP upon payment in full of the Judgment; AND

B.     Prejudgment interest on the judgment amount awarded; AND

C.     An award of exemplary damages found by the jury to be warranted by the conduct of MEP and Enright; AND

D.      All legal fees or other expenses and costs incurred by Warbros in connection with

       enforcement of its rights under the Participation Agreement; AND

E.      Such other and further relief as is just and reasonable.

Burlington, Vermont                     January 13, 2009

                                   DOWNS RACHLIN MARTIN PLLC

By:

                                   Andre D. Bouffard
                                   Attorneys for Plaintiff
                                   199 Main Street
                                   P.O. Box 190
                                   Burlington, VT  05402-0190
                                   (802) 863-2375

2905529.1

DOWNS
RACHLIN
MARTIN PLLC